UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

*In re*:

WINDSTREAM HOLDINGS INC., *et al.*,

                       Debtors.
-----------------------------------------------------------------------x

GLM DFW, Inc.,

                       Appellant,

       - against -

WINDSTREAM HOLDINGS INC., *et al.*,

                       Appellees.

-----------------------------------------------------------------------x

**OPINION AND ORDER**

No. 19-CV-4854 (CS)

<u>Appearances</u>:

Davor Rukavina
Munsch Hardt Kopf & Harr, P.C.
Dallas, Texas
*Counsel for Appellant*

Stephen E. Hessler
Mark Kieselstein
Kirkland & Ellis LLP
Kirkland & Ellis International LLP
New York, New York

James H.M. Sprayregen
Ross M. Kwasteniet
Brad Weiland
Kirkland & Ellis LLP
Kirkland & Ellis International LLP
*Counsel for Debtors-Appellees*
Chicago, Illinois

<u>Seibel, J.</u>

Before the Court is the appeal of Appellant GLM DFW, Inc. ("GLM") from the Bankruptcy Court's April 22, 2019 Final Order Authorizing the Debtors to Pay Certain Prepetition Claims of (I) Critical Vendors, (II) Lien Claimants, and (III) Section 503(b)(9) Claimants in the Ordinary Course of Business on a Postpetition Basis, (Bankr. Doc. 377 ("Final Order")).[1]  For the following reasons, the Bankruptcy Court's order is AFFIRMED.

## I.     <u>BACKGROUND</u>

Debtors-Appellees Windstream Holdings, Inc., *et al.* ("Debtors") are providers of "advanced network communications and technology solutions for businesses across the United States"; "offer broadband, entertainment and security solutions to consumers and small businesses primarily in rural areas in 18 states"; and "supply core transport solutions on a local and long-haul fiber network spanning approximately 150,000 miles."  (Bankr. Doc. 2 ¶ 5.)  GLM "provided waste management, hauling, and recycling brokerage and advisory services" to Debtors, and is a prepetition creditor of Debtors "with an unsecured claim for almost $2 million."  (Doc. 8 ("GLM's Mem.") at 5.)  GLM provided services to Debtors "pursuant to an executory contract under which it would have been obligated to continue to perform [after Debtors' bankruptcy filing] pending the Debtors' decision to assume or reject (or GLM's obtaining relief from the Bankruptcy Court)."  (Doc. 9 ("Debtors' Mem.") at 2.)

On February 25, 2019, Debtors filed voluntary petitions for relief under chapter 11 of the U.S. Bankruptcy Code (the "Bankruptcy Code" or the "Code").  (Bankr. Doc. 1.)  After filing their petitions, Debtors "continue[d] to operate their business and manage their property as

---

[1] References to "Bankr. Doc." refer to documents filed on the docket in the underlying proceeding in the Bankruptcy Court for the Southern District of New York under docket number 19-22312.  References to "Doc." are to documents filed on this Court's docket.

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code." (Bankr. Doc. 2 ¶ 7.)  The same day that Debtors filed their Chapter 11 petitions, they filed a motion for "Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Claims of (I) Critical Vendors, (II) Lien Claimants, and (III) Section 503(b)(9) Claimants in the Ordinary Course of Business on a Postpetition Basis."  (Bankr. Doc. 16 ("Vendor Motion").)  In their motion, Debtors noted that they "identified approximately 263 vendors as Critical Vendors" and "believe[d] they owed the Critical Vendors approximately $80 million," which was approximately twenty percent of Debtors' outstanding accounts payable.  (*Id.* ¶¶ 14-15.)  Debtors identified the critical vendors by

> reviewing and analyzing their books and records, consulting operations managers and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable law, regulations, and historical practice to identify certain critical business relationships and suppliers of goods and services – the loss of which would immediately and irreparably harm their businesses, by, among other things, shrinking their market share, reducing enterprise value, and ultimately impairing the Debtors' viability as a going-concern.

(*Id.* ¶ 13.)  Debtors added that in determining which vendors were critical, they specifically answered ten questions:

> • whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;
>
> • whether a vendor is a sole-source, limited-source, or high-volume supplier of goods or services critical to the Debtors' business operations;
>
> • whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;
>
> • whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;
>
> • the degree to which replacement costs (including, pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

• whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor;

• the likelihood that a temporary break in the vendor's relationship with the Debtors could be remedied through use of the tools available in these chapter 11 cases;

• whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, or refuse to ship inventory or to provide critical services on a postpetition basis;

• the location and nationality of the vendor; and

• whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

(*Id.*) Debtors explained that "[a]ny material interruption in the provision of the Critical Vendor Products and Services – however brief – would disrupt the Debtors' operations and could cause irreparable harm to the Debtors' businesses, goodwill, employees, customer base, and market share," which "would likely far outweigh the cost of payment of the Critical Vendor Claims." (*Id.* ¶ 16.)

Debtors also estimated that they owed "approximately $91 million . . . to Lien Claimants," (*id.* ¶ 20), and "owed approximately $13 million on account of the 503(b)(9) Claims," (*id.* ¶ 23).[2] The Vendor Motion did not identify Debtors' critical vendors, lien claimants, or 503(b)(9) claimants, but it is undisputed that GLM did not fall under any of these categories.

The Vendor Motion included a proposed interim order providing that

The Debtors shall maintain a matrix summarizing amounts paid on account of the Critical Vendor Claims subject to the terms of this Interim Order, including the

---

[2] Section 503(b)(9) provides that debtors in Chapter 11 proceedings may, "[a]fter notice and a hearing," pay out expenses including "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9).

following information: (a) the name of the Critical Vendor paid; (b) the amount paid to each Critical Vendor (each a "Payment"); (c) the total amount paid to the Critical Vendor to date; (d) the Debtor or Debtors who made the Payment; (e) the date of the Payment; and (f) the purpose of the Payment. This matrix will be provided every week to the U.S. Trustee and any statutory committee of creditors appointed in these chapter 11 cases. The Debtors shall provide the U.S. Trustee, any statutory committee of creditors, and to the Court for an *in camera* review, with a complete list of the Debtors' Critical Vendors.

(*Id.* Ex. A ¶ 4.)

On February 28, 2019, the Bankruptcy Court entered an "Interim Order" granting the Vendor Motion on an interim basis and scheduled a final hearing on the motion as well as a date by which creditors could object. (Doc. 61 ("Interim Order").) The Interim Order required Debtors to provide to the U.S. Trustee and committee of creditors, on a weekly basis, the "matrix" they described in their motion. (*Id.* ¶ 4.) Debtors were also required to provide their entire critical-vendors list to the U.S. Trustee, the committee of creditors, and the Bankruptcy Court for *in camera* review. (*Id.*)

On March 28, 2019, GLM objected to the Interim Order on three grounds:

(i) that it was for the Bankruptcy Court to decide who was a critical vendor, lien claimant, or 503(b)(9) claimant, and not the Debtors; (ii) that the Bankruptcy Code required the disclosure of the identity of the prepetition creditors being paid and the amounts being paid, and that no grounds to seal this information existed; and (iii) that the Bankruptcy Court either failed to impose any standard, or identified an impermissible standard, on what facts and circumstances qualified a creditor to be a critical vendor.

(GLM's Mem. at 5-6; *see* Bankr. Doc. 204.) No other party in interest objected to the Vendor Motion. (Debtors' Mem. at 7.) In response to GLM's objections, Debtors filed a reply in support of their motion. (Bankr. Doc. 291.)

The Bankruptcy Court held a final hearing on the Vendor Motion April 16, 2019. (Doc. 3 ("Hearing Tr.").)[3]  At the hearing, the Bankruptcy Court heard the testimony of Nick Grossi, who provided consultant services to Debtors "to ensure a smooth transition into Chapter 11." (*Id.* at 72:1-3.)  Grossi testified that he and his team "validated the [Debtors'] assertion of their critical vendor list."  (*Id.* at 75:2-3.)  They did so by, among other things, reviewing Debtors' financial documents and speaking with Debtors' employees, (*id.* at 75:17-76:23), to answer the following questions about each vendor listed:

> [I]f that vendor were to cease providing service or to stop shipping product, would that cause disruption to the business and would that disruption cause irreparable harm[?]  Could that vendor be resourced?  Is there an alternative where we could go out and find an alternative for that vendor?  The questions that we had to ask ourselves for vendors who provide product and provide a service, how specific is this?  Is it something that has been certified, and it's a lengthy certification process to get the equipment? . . . Can they disrupt the business and can we resource this?

(*Id.* at 77:3-16.)  Grossi testified that he had used this "robust" process "many times" in the past to determine a debtor's critical vendors.  (*Id.* at 77:22-24.)  But Grossi noted that identification of the critical vendors was just the start of the process, and he and his team would meet "every day" to determine which of the critical vendors actually needed to be paid.  (*Id.* at 78:5-25.)  He testified that using this "flexibl[e]" approach was necessary to ensure that Debtors could continue to operate their business and deal with critical vendors – including "irrational" vendors or those that seek "to do harm to [Debtors]" – which was paramount to Debtors' successful reorganization.  (*Id.* at 79:15-80:1.)

---

[3] Doc. 3 contains GLM's list of documents from the Bankruptcy Court docket to be considered on appeal, as well as the transcript from the April 16 hearing.  All citations to the "Hearing Tr." refer only to the transcript of the hearing, which is Exhibit A to Doc. 3 beginning at page 4 and consecutively paginated from there, starting with page "1."

Grossi testified that Debtors did not tell the vendors that they were on the critical vendor list, and added that in his thirteen years as a consultant to debtors in bankruptcy, he had never once "published a list or articulated to a vendor that they were on a list." (*Id.* at 80:2-8.) Grossi explained that "[t]elling a vendor that they're on a list deprives [Debtors] of any leverage that the[y] may have in a negotiation with that vendor, number one. Number two, if you were to publish that list, my concern is that you would have what was essentially a run on the bank." (*Id.* at 80:8-12.) And keeping the list confidential was seemingly proving effective, as Grossi and the Debtors determined that there was a "critical vendor bucket [of] $81 million," but at the time of the hearing, Debtors had paid out only $6.7 million of it. (*Id.* at 79:8-12.)

At the hearing, Grossi stated that he had spoken with "[p]robably six" of the vendors on the critical vendor list, (Hearing Tr. at 86:21-87:1), and when GLM's counsel asked, "What are the six [critical vendors] that you spoke to, the names," the Bankruptcy Court sustained Debtors' objection, (*id.* at 87:5-18). GLM states that the Bankruptcy Court "refused to permit questioning as to the identity of the prepetition creditors proposed to be paid, and no evidence on that point was offered." (GLM's Mem. at 6.) After its ruling, the Bankruptcy Court added, "It's obvious to me that someone who wants to be a critical vendor is trying to harm this company by getting it to disclose information that is detrimental to the company and of no use whatsoever to [GLM, . . . [w]ho has taken a strategy to violate the automatic stay and cut itself off from the potential of having its executory contract being assumed and its defaults cured." (Hearing Tr. at 87:21-88:4.) The Bankruptcy Court later stated that "there is an evidentiary record here," which "shows the process that the Debtors go through with supervision by the creditors' committee, who does not have a parochial axe to grind like individual vendors do." (*Id.* at 108:10-13.)

The Bankruptcy Court also noted that the ten questions that Debtors said that they answered in creating their list of critical vendors, (Vendor Motion ¶ 13), were

> the very questions that I started asking of Debtors ten years ago, and that's how this process got developed. That was from bitter experience in practice, and in earlier cases, where cases literally died because judges didn't believe they had this authority, notwithstanding Section 363(b), which was perfectly clear to Judge Easterbrook, who cited 363(b) in [*In re Kmart Corp.*, 359 F.3d 866, 872 (7th Cir. 2004)], but left it up to the Courts to adopt a proper evidentiary framework for making the determination, which I believe exists here.

(Hearing Tr. at 108:15-23.) The Bankruptcy Court added that, under § 363(b), it could permit Debtors "to spend money to provide a net benefit to their estate in their business judgment, as reviewed by the Court," to ensure that the process "is sufficient" and "protect[s] the Debtor[s'] business for all constituents." (*Id.* at 109:11-17.) The Bankruptcy Court stated that it had undertaken that analysis, (*see id.* at 108:15-109:3), and chastised GLM, stating, "This is a parochial narrow objection, couched as if it's being brought on behalf of all vendors, and it just isn't," (*id.* at 109:3-5). The Bankruptcy Court denied GLM's objection, granted Debtors' motion, and concluded as follows:

> Based on the evidentiary record before me, the process that the Debtors have adopted here, which has been adopted in numerous cases over the last years at least, and is being implemented here by sophisticated parties who understand the legal and business issues clearly supports the determination that I am making that the flexibility that the Debtors have to make these payments is critical to their ongoing operations and success, in a case where they have a relatively narrow budget, where cash management is important, leaving them their judgment, as overseen by the official committee of unsecured creditors, to make payments only where absolutely needed, and to preserve their leverage in doing so, so that their identification of who is critical does not become public, to ensure [there was no] immediate run on the bank is not only authorized, but a proper exercise of judgment here.

(*Id.* at 109:19-110:16.)[4]

On April 22, 2019, the Bankruptcy Court entered the Final Order, in which it "authorized, but [did] not direct[]" Debtors,

> in their sole discretion, to continue their prepetition business operations, policies, and programs and pay any accrued but unpaid prepetition Vendor claims on a postpetition basis in the ordinary course of business or as may be necessary to secure a vendor's agreement to continue business with the Debtors on Customary Trade Terms, up to the amount set forth for each category of Vendor Claims set forth in the Motion.

(Final Order ¶ 2.)[5] The Bankruptcy Court stated that the relief granted would "provide a material net benefit to the Debtors' estates and creditors after taking into account the Bankruptcy Code's priority scheme." (*Id.* at 2.) Additionally, Debtors were required to update on a weekly basis the matrix of payments they were required to prepare under the Interim Order and provide it to the U.S. Trustee and the Official Committee of Unsecured Creditors. (*Id.* ¶ 3.) If Debtors wished to make a critical vendor payment "materially inconsistent with the projected critical vendor payments set forth on the vendor matrix provided to the Committee," they had to consult the Committee's counsel regarding the proposed payment and give three business days' notice in advance of the payment. (*Id* ¶ 4.)[6] Debtors were further required to provide the full list of critical vendors to the U.S. Trustee, the Official Committee of Unsecured Creditors' advisors, and the Bankruptcy Court for *in camera* review "as soon as reasonably practicable." (*Id.* ¶ 3.)

---

[4] The Hearing Tr. reflects that the Bankruptcy Court said it was keeping the list confidential "to ensure an immediate run on the bank," but this must have been a transcription error, because the court was clearly trying to ensure no such run.

[5] By reference back to the Vendor Motion, it was apparent that the Final Order authorized payment not of any prepetition vendor claims, but only of those of critical vendors, lien claimants, and 503(b)(9) claimants.

[6] If three days was not practicable, notice had to be given as soon as reasonably practicable.

The Bankruptcy Court stated that the procedures set forth were "calculated to result only in the payment of those claims to the extent necessary to the operation of the Debtors' business upon appropriate terms." (*Id.* at 2.)

Also on April 22, 2019, the Bankruptcy Court authorized procedures by which Debtors could reject or assume executory contracts. (Bankr. Doc. 393.) Pursuant to those procedures, on May 15, 2019, Debtors petitioned to reject their executory contract with GLM as of June 1, 2019. (Bankr. Doc. 536 at 2; *id.* Ex. 2.) GLM did not object to Debtors' petition, and the Bankruptcy Court approved Debtors' rejection on July 15, 2019. (Bankr. Doc. 808 at 2.) Accordingly, Debtors currently have no active vendor relationship with GLM.

## II.  **LEGAL STANDARD**

This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) to hear appeals from final judgments, orders, and decrees of a bankruptcy court. A district court reviews a bankruptcy court's findings of fact for clear error and its legal conclusions *de novo*. *Overbaugh v. Household Bank, N.A.* (*In re Overbaugh*), 559 F.3d 125, 129 (2d Cir. 2009) (*per curiam*). "When reviewing for clear error, [the Court] may reverse only if [it is] left with the definite and firm conviction that a mistake has been committed." *United States v. Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015) (internal quotation marks omitted). "Thus, if the factual findings of the bankruptcy court are plausible in light of the record viewed in its entirety, this Court may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Savage & Assocs., P.C. v. Williams Commc'ns* (*In re Teligent Servs., Inc.*), 372 B.R. 594, 599 (S.D.N.Y. 2007) (internal quotation marks omitted). "And where there are two permissible views of the evidence, the factfinder's choice between

them cannot be clearly erroneous." *Lawsky v. Frontier Ins. Grp., LLC* (*In re Frontier Ins. Grp., Inc.*), 598 B.R. 87, 96 (S.D.N.Y. 2019) (internal quotation marks omitted).

## III. DISCUSSION

### A. Standing

Standing is a "threshold question in every federal case, determining the power of the court to hear the suit." *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) (internal quotation marks omitted). In addition to the requirements imposed by Article III of the Constitution, an appellant in a bankruptcy case must be "a person directly and adversely affected pecuniarily by the challenged order of the bankruptcy court." *Sumpter v. DPH Holdings Corp.* (*In re DPH Holdings Corp.*), 468 B.R. 603, 612 (S.D.N.Y. 2012) (internal quotation marks omitted); *id.* ("The aggrieved person standard requires that an appellant show both injury in fact under Article III, and that the injury suffered is direct and financial.") (internal quotation marks omitted). The "aggrieved person" standard for bankruptcy standing "reflects the understandable concern that if appellate standing is not limited, bankruptcy litigation will become mired in endless appeals brought by the myriad of parties who are indirectly affected by every bankruptcy court order." *Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs.* (*In re Colony Hill Assocs.*), 111 F.3d 269, 273 (2d Cir. 1997) (internal quotation marks and alteration omitted); *see Licensing by Paolo, Inc. v. Sinatra* (*In re Gucci*), 126 F.3d 380, 388 (2d Cir. 1997) ("The stringency of [the 'aggrieved person' standard] is rooted in a concern that freely granting open-ended appeals to those persons affected by bankruptcy court orders will sound the death knell of the orderly disposition of bankruptcy matters."). As the "aggrieved person" standard is more stringent than the constitutional requirements, *In re Combustion Eng'g*, 391 F.3d 190, 214-15 (3d Cir. 2004); *see In re Johns-Manville Corp.*, 340 B.R. 49, 56 (S.D.N.Y. 2006), *vacated on*

*other grounds*, 517 F.3d 52 (2d Cir. 2008), GLM cannot proceed with this appeal if it cannot demonstrate that it suffered a direct financial injury as a result of the Final Order.

Debtors argue that GLM does not have standing because it is "a prepetition unsecured creditor with no active relationship with the Debtors, and reversing or altering the Vendor Motion would not directly or adversely affect GLM pecuniarily." (Debtors' Mem. at 12.) Debtors argue that payment to critical vendors, lien claimants, and 503(b)(9) claimants "would not negatively affect GLM's ability to ultimately secure payment on its unsecured claim under a confirmed chapter 11 plan" because "Lien Claims and 503(b)(9) Claims are senior to GLM's unsecured claim and would thus be entitled to payment prior to GLM irrespective of timing," and "[p]ayment of Critical Vendor Claims, as recognized by the Bankruptcy Court, increases and indeed maximizes the value of the Debtors' bankruptcy estates." (*Id.*) The Court disagrees that these factors negate standing.

GLM is undisputedly one of Debtors' unsecured creditors. "As a general rule, creditors have standing to appeal orders of the bankruptcy court disposing of property of the estate because such orders directly affect the creditors' ability to receive payment of their claims." *Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636, 642 (2d Cir. 1988); *see Dish Network Corp. v. DBSD N. Am., Inc.* (*In re DBSD N. Am., Inc.*), 634 F.3d 79, 89 (2d Cir. 2011) (same). In fact, the Second Circuit in *In re DBSD North America* surveyed cases and could find no example of a creditor lacking standing to challenge the disposition of estate assets. *See* 634 F.3d at 90-91. It may be true as a substantive matter that the Final Order ultimately makes it more likely GLM will be paid, but as a standing matter GLM correctly argues that its pecuniary interest as an unsecured creditor is adversely affected by the payment of Debtor's assets to critical vendors, lien claimants, and 503(b)(9) claimants. That GLM's interest in

Debtors' assets is "several rungs lower on the ladder of priority" than the interests of such claimants does not mean GLM does not have standing, as the standing inquiry has "never demanded more to accord a creditor standing than that it has a valid and impaired claim," *id.* at 90, which Debtors do not dispute GLM has. As GLM is a creditor that is challenging the Bankruptcy Court's order disposing of property of the estates, it has standing to bring this appeal.

### B. Critical Vendors, Lien Claimants, and 503(b)(9) Claimants

"A basic tenet of bankruptcy law is that all assets of the debtor . . . are assets of the bankruptcy estate that must be scheduled for the benefit of creditors." *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 52 (S.D.N.Y.), *order amended on denial of reconsideration*, 63 F. Supp. 2d 342 (S.D.N.Y. 1999). "Distributions of estate assets at the termination of a business bankruptcy normally take place through . . . a Chapter 11 plan, . . . governed by priority." *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017). "Chapter 11 plans provide some[] . . . flexibility," but "[t]he Code's priority system constitutes a basic underpinning of business bankruptcy law." *Id.* Accordingly, debtors who file for Chapter 11 bankruptcy generally cannot pay prepetition debts postpetition until a plan governed by priority is confirmed. There are, however, exceptions to this rule. "Courts, for example, have approved 'first-day' wage orders that allow payment of employees' prepetition wages, 'critical vendor' orders that allow payment of essential suppliers' prepetition invoices, and 'roll-ups' that allow lenders who continue financing the debtor to be paid first on their prepetition claim." *Czyzewski*, 137 S. Ct. at 985.

GLM does not dispute that "courts in this District authorize the payment to the 'critical vendor' when the payment is 'critical to the debtor's reorganization.'" (GLM's Mem. at 10 (quoting *In re Fin. News Network Inc.*, 134 B.R. 732, 736 (Bankr. S.D.N.Y. 1991).) But GLM

argues that the Bankruptcy Court erred by (1) impermissibly delegating authority to Debtors to determine which vendors were critical; (2) keeping the list of critical vendors, lien claimants, and 503(b)(9) claimants confidential; (3) denying GLM adequate process; and (4) failing to apply the correct legal standard regarding critical vendors. GLM acknowledges that, with respect to lien claimants and 503(b)(9) claimants, a "debtor does not discriminate against unsecured creditors if it pays these claims first, and in full." (GLM's Mem. at 14.) "With respect to lien claimants and 503(b)(9) claimants, therefore, GLM does not question that the Bankruptcy Court could authorize these claimants to be paid prior to a plan." (*Id.*) Instead, "GLM's appeal regarding these issues is limited to keeping the identities of these creditors confidential and secret, and to the fact that the Bankruptcy Court permitted the Debtors to decide which creditors qualified, rather than making that decision itself." (*Id.*)

### 1.    Delegation of Authority

GLM argues that "[t]he most serious problem with the Order is the delegation of the judicial function to the Debtors, whereby the Bankruptcy Court has permitted the Debtors to decide questions of fact," including "who is a critical vendor, who is a lien claimant, and who is a 503(b)(9) claimant." (*Id.* at 14-15.) But GLM's argument ignores the fact that Debtors submitted a motion to the Bankruptcy Court in which it explained how it identified its critical vendors – providing both the process and substantive criteria considered in making the determinations – and provided to the U.S. Trustee and Official Committee of Unsecured Creditors the matrix of payments to critical vendors, including their identities and information on the purpose of each payment. (Vendor Motion ¶¶ 4, 13-14.) Debtors were also required to provide the U.S. Trustee, Official Committee of Unsecured Creditors, and the Bankruptcy Court with the full list of critical vendors. (Final Order ¶ 3.)

The Bankruptcy Court noted that the process by which Debtors determined their critical vendors was based on "the very questions" that the Bankruptcy Court typically asked debtors, the answers to which provided the "proper evidentiary framework" for making the critical vendor determination. (Hearing Tr. at 108.) While the Bankruptcy Court relied on Debtors' representations that they accurately answered those questions outside of court, such reliance was not an impermissible delegation of authority. In fact, courts require payments to critical vendors to be "in the sound business judgment of the debtor." *In re United Am., Inc.*, 327 B.R. 776, 782 (Bankr. E.D. Va. 2005); *see In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (before a bankruptcy court can authorize an expenditure of funds outside of the ordinary course of business, debtor must "articulate some business justification"). And reliance on Debtors' business judgment is especially appropriate here considering the time and resources it would take to have the Bankruptcy Court ask, and Debtors respond to, those questions for each of the 263 vendors in open court. *Cf. In re MF Glob. Holdings Ltd*., 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012) ("Establishing an efficient and effective procedure [by which debtors can reject executory contracts] will also relieve the Court of the burden of hearing numerous motions seeking the same relief.").

Court supervision of each individual critical-vendor designation is not only impractical in large bankruptcies – indeed, as Judge Drain noted, the company would likely go under before such hearings could occur, (Hearing Tr. 104-06, 109) – but it was unnecessary here, given the oversight of the U.S. Trustee and the creditors' committee of both the designations and the payments, and the ability of the Bankruptcy Court to hear objections. Particularly where Debtors had designated only 263 vendors out of approximately 16,000, (*see id.* at 82:16-18), had an outside consultant validate those choices, and had negotiated so effectively that that they had

used only a small fraction of the allotted funds in the weeks between the Interim and Final Orders, the Bankruptcy Court had every reason to believe that permitting Debtors to exercise their business judgment – using the proper criteria and with a capped dollar amount – would maximize estate assets for the benefit of Debtors and their creditors.

As pointed out by Debtors, bankruptcy courts routinely rely on debtors' representations and business judgment to identify critical vendors. *See In re Synergy Pharm. Inc.*, No. 18-14010 (Bankr. S.D.N.Y. Jan. 7, 2019), Doc. 184; *In re Sears Holdings Corp.*, No. 18-23538 (Bankr. S.D.N.Y. Nov. 16, 2018), Doc. 793; *In re Tops Holding II Corp.*, No. 18-22279 (Bankr. S.D.N.Y. Mar. 22, 2018), Doc. 183; *In re Avaya Inc.*, No. 17-10089 (Bankr. S.D.N.Y. Feb. 10, 2017), Doc. 139; *In re SunEdison, Inc.*, No. 16-10992 (Bankr. S.D.N.Y. Jun. 8, 2016), Doc. 515; *In re Relativity Fashion, LLC*, No. 15-11989 (Bankr. S.D.N.Y. Aug. 27, 2015), Doc. 334; *In re Great Atl. & Pac. Tea Co., Inc.*, No. 15-23007 (Bankr. S.D.N.Y. Aug. 11, 2015), Doc. 503; *In re Great Atl. & Pac. Tea Co., Inc.*, No. 10-24549 (Bankr. S.D.N.Y. Jan. 12, 2011), Doc. 504. Instead of identifying any precedent suggesting that this is an unlawful delegation of authority, GLM cites to three Supreme Court cases that are each more than forty years old (and two of which were decided before 1950), none of which relates to critical-vendor designations or even bankruptcy in general. (*See* GLM's Mem. at 19-20 (first citing *Morgan v. United States*, 298 U.S. 468, 480-81 (1936); then citing *United States v. Raddatz*, 447 U.S. 667, 683 (1980); and then citing *Holiday v. Johnston*, 313 U.S. 342, 351-52 (1941).) And the bankruptcy cases that GLM cites – *In re Lively*, 266 B.R. 209, 216 (Bankr. N.D. Okla. 1998); *In re Structurlite Plastics Corp.*, 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988); *Pension Benefit Guar. Corp. v. Braniff Airways, Inc.* (*In re Braniff Airways Inc.*), 700 F.2d 935, 940 (5th Cir. 1983) – have nothing to do with critical vendors, let alone whether a bankruptcy court's deference to a debtor's

representations and business judgment regarding which vendors were critical (within a court-approved framework and subject to review) was found to be an impermissible delegation of authority.

For the same reasons, GLM's argument that the Bankruptcy Court impermissibly delegated authority to Debtors to determine lien claimants and 503(b)(9) claimants is unconvincing.

Accordingly, GLM's delegation argument is rejected.

### 2. Confidentiality and Sealing

GLM next argues that the Bankruptcy Court committed reversible error by allowing Debtors to keep secret their list of critical vendors, lien claimants, and 503(b)(9) claimants. Specifically, GLM argues that under the Bankruptcy Code, all information must be publicly filed unless it is "a trade secret or confidential research, development, or commercial information." (GLM's Mem. at 24 (internal quotation marks omitted).) Indeed, "[s]ection 107(a) of the Bankruptcy Code provides that, with certain limitations, all papers '*filed in a case* under this title are public records and open to examination by an entity at reasonable times without charge.'" *In re Ditech Holding Corp.*, No. 19-10412, 2019 WL 3294684, at *9 (Bankr. S.D.N.Y. July 19, 2019) (quoting 11 U.S.C. § 107(a)) (alteration omitted) (emphasis added). But the list of critical vendors, lien claimants, and 503(b)(9) claimants was never filed in the bankruptcy action, and thus § 107 was never triggered. And GLM did not argue or provide authority that a party must file papers identifying these categories of creditors in a bankruptcy case, despite Debtors arguing this point in their opposition brief. (Debtors' Mem. at 23-24.) Indeed, the cases that GLM cites regarding § 107 all have to do with documents that were actually filed. *See Video Software Dealers Ass'n v. Orion Pictures Corp* (*In re Orion Pictures Corp.*), 21 F.3d 24 (2d Cir. 1994)

(parties seeking to seal, among other things, licensing agreement filed with bankruptcy court); *In re Ditech Holding Corp.*, 2019 WL 3294684, at *9 (parties seeking to seal settlement documents that must be filed pursuant to Bankruptcy Rule 9019); *Geltzer v. Andersen Worldwide, S.C.*, No. 05-CV-3339, 2007 WL 273526, at *1 (S.D.N.Y. Jan. 30, 2007) (same).

GLM further argues that it can find "[n]o opinion that . . . permits a debtor to keep the identity of 'critical vendors' confidential." (GLM's Mem. at 29.). But to support this argument, GLM cites to *In re Ionosphere*, in which a court allowed a debtor to pay, before confirming a plan, the prepetition claims of its active employees but not its striking employees. *See* 98 B.R. at 174-75. Not only does that case address a different issue, but there is no indication that the debtor or the court there specifically identified any of the employees to be paid. GLM thus relies on a case in which the court decided which employees to pay on a categorical basis without identifying any of them, as authority that Debtors here should be required to file and subsequently move to seal a list specifically identifying all of their critical vendors. GLM also cites to a case where the parties filed documents identifying seven critical vendors, *In re CoServ, LLC*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002), but that a party chose – in one out-of-circuit case – to file a document identifying its critical vendors simply does not mean that all debtors are under an obligation to file such documents, let alone that any such document cannot be sealed. The cases GLM cites simply do not establish that debtors are required to file publicly a list identifying their critical vendors, lien claimants, and 503(b)(9) claimants, nor do they establish that those lists cannot be sealed.[7]

---

[7] GLM's reliance on *Armstrong World Industries, Inc. v. James A Phillips, Inc.* (*In re James A. Phillips, Inc.*), 29 B.R. 391, 395 (S.D.N.Y. 1983), is similarly unavailing. In that case, the bankruptcy court authorized an accelerated payment to a potential lienor without a hearing and without providing any notice to the other creditors. *Id.* at 392. Ultimately, the bankruptcy

Debtors, however, have provided numerous examples where bankruptcy courts have allowed debtors to not file such lists or not disclose the identities of critical vendors, lien claimants, and 503(b)(9) claimants. *See In re Aegean Marine Petrol. Network Inc.*, No. 18-13374 (Bankr. S.D.N.Y. Dec. 6, 2018), Doc. 150 ¶ 5 ("Matrix will be provided on a biweekly basis (or as otherwise agreed with counsel to the Committee) to the professionals retained by the Committee; *provided* that the professionals for the Committee shall keep the Specified Trade Claimant Matrix confidential and shall not disclose any of the information in the matrix to anyone, including, but not limited to, any member of the Committee, without the prior written consent of the Debtors.") (emphasis in original); *In re Avaya Inc.*, No. 17-10089, Doc. 139 ¶ 15 ("The Debtors shall provide such matrix[] on a confidential and professionals'-eyes-only basis[] to the U.S. Trustee, the advisors to the Committee, the advisors to the DIP Agent, and the advisors to each of the Ad Hoc Groups, every two weeks . . . ."); *In re BCBG Max Azria Glob. Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. Mar. 29, 2017), Doc. 234 ¶ 3 ("The Debtors

court there permitted a hearing on whether it should vacate its authorization, but after the hearing, declined to do so. *Id.* at 395. On appeal, the district court held that "some sort" of notice must "be given to creditors of the estate before accelerated payments to potential lienors are authorized," and that creditors "should have an opportunity to be heard, however summarily, before the accelerated payments are formally authorized by a Bankruptcy Court." *Id.* at 395. The court clarified that "[t]he notice required, however, should not be permitted to undermine the capacity of the debtor in possession to accomplish the legitimate ends sought by the transactions at issue." *Id.* Thus, in that case, "the only notice required was a telephone call informing [the creditor] that [the debtor] intended to seek the relief involved, and a brief opportunity (measured in hours rather than days) to examine and verify the fundamental facts alleged." *Id.* Because the bankruptcy court held a hearing, "however summarily," and because failure to provide notice was harmless, the district court affirmed the bankruptcy court's authorization of the accelerated payment. *Id.* at 395-398. Here, the Bankruptcy Court provided notice, allowed briefing, and held a hearing on the critical-vendor issue. This was more notice than what was provided in *In re James A. Phillips, Inc.*, and in any event, was far more than the "summar[y]" notice and hearing that the court there held was necessary. Indeed, the Bankruptcy Court properly balanced the need for notice and a hearing while also ensuring that Debtors could "accomplish the legitimate ends" of paying their critical vendors to ensure their rehabilitation. Accordingly, *In re James A. Phillips, Inc.*, supports affirming, not reversing, the Bankruptcy Court.

shall maintain a matrix of amounts paid in accordance with this Order . . . and provide such matrix on a monthly basis to the Official Committee of Unsecured Creditors . . . ; *provided, however* that the Committee's professionals shall keep the Claims Matrix confidential and shall not disclose any of the information in the matrix to anyone . . . .") (emphasis in original); *In re Hawker Beechcraft, Inc.*, No. 12-11873 (Bankr. S.D.N.Y May 30, 2012), Doc. 178 ¶ 6 ("The Debtors shall maintain a matrix summarizing (i) the name of each Critical Vendor . . . paid and (ii) the amount paid to each such Critical Vendor . . . . The Debtors shall provide this matrix to the United States Trustee . . . and the professionals retained by the Committee on a weekly basis, *provided that* the U.S. Trustee and the Committee's professionals shall keep the matrix confidential and shall not disclose to anyone . . . the names of . . . and the amount paid to each such Critical Vendor . . . .") (emphasis in original).

Moreover, even if Debtors were required to file the list, courts have held that redacting the names of vendors is a proper exercise of § 107's commercial information exception. *See, e.g.*, *In re Borders Grp., Inc.*, 462 B.R. 42, 48 (Bankr. S.D.N.Y. 2011) ("The [properly] redacted information primarily relates to the identities of key employees and vendors . . . ."). Section 107 "protects parties from the release of information that could cause them harm or give competitors an unfair advantage." *Togut v. Deutsche Bank AG* (*In re Anthracite Capital, Inc.*), 492 B.R. 162, 177 (Bankr. S.D.N.Y. 2013) (internal quotation marks omitted); *see Gowan v. Westford Asset Mgmt. LLC* (*In re Dreier LLP*), 485 B.R. 821, 823 (Bankr. S.D.N.Y. 2013) (same). Debtors argued below, and the Bankruptcy Court found, that releasing this information publicly would harm Debtors' estate by reducing Debtors' negotiating leverage with the critical vendors and possibly precipitating a "run on the bank" in which they all demanded immediate payment. (Hearing Tr. at 80:10-12, 106:25-107:2.) Accordingly, the information would likely be properly

sealed as commercial information. *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Madoff*), No. 08-01789, 2011 WL 1378602, at *3 (Bankr. S.D.N.Y. Apr. 12, 2011) (applying § 107 where public disclosure "could seriously jeopardize [a party's] financial viability").[8]

Accordingly, the Bankruptcy Court did not commit reversible error, as it was under no obligation to force Debtors to file the list in question, and therefore Debtors were under no obligation to seek a sealing order, and even if they were, the list was likely commercial information.

### 3. Due Process

GLM next argues that it was "evident from the hearing on the [Vendor] Motion" that it was denied due process. (GLM's Mem. at 31.) Aside from its arguments about delegation and sealing (addressed above), GLM points to only one aspect of the hearing. GLM argued that Debtors should be required to provide the identities of the vendors to be paid in full – that is, the critical vendors, lien claimants and 503(b)(9) claimants – but the Bankruptcy Court said that was a matter for argument after the evidence. (Hearing Tr. at 69:12-20.) Then "[w]hen GLM asked

_____

[8] The case on which GLM relies heavily in its reply, *In re Ditech Holding Corp.*, 2019 WL 3294684, at *9, does not compel a different result. GLM says that the *Ditech* Court rejected debtors' argument that "disclosing the information publicly would lead to 'a competitive disadvantage if the Court unseals the redacted information because they will lose leverage in future negotiations.'" Doc. 10 at 7 (quoting *In re Ditech Holding Corp.*, 2019 WL 3294684, at *9).) But there a party settling with the debtors feared that revelation of the settlement terms would result in its competitive disadvantage from loss of leverage in future negotiations with third parties. *In re Ditech*, 2019 WL 3294684, at *9. The court merely reiterated the point that "the cases are clear that bargaining leverage in *future unrelated* cases does not rise to the level of 'commercial information' under section 107(b)." *Id.* (emphasis added). Here, Debtors are not worried about losing leverage in future unrelated cases, but instead are attempting to ensure their own rehabilitation for, at least in part, the sake of their creditors. *In re Ditech* says nothing of whether a bankruptcy court may seal as commercial information the debtor's critical vendors and amounts due to them, which, if not sealed, may seriously harm the debtor's estate in the instant action.

the Debtors' witness for the names of the critical vendors [to whom he had spoken and] the Debtors objected on relevance," (GLM's Mem. at 31), the Bankruptcy Court sustained the objection and said that GLM was seeking this information in order to "harm th[e] company" and that the information was "of no use whatsoever to the objectant." (Hearing Tr. at 87:15-24.)

GLM's due process argument is unconvincing. The Bankruptcy Court accepted briefing on GLM's objection, (Bankr. Doc. 204), and heard GLM's arguments on these exact points at the hearing, (Hearing Tr. at 68:4-69:20, 100:18-109:20). There is no indication that the Bankruptcy Court did not consider the arguments GLM made in its papers or at the hearing. It is thus not entirely clear to the Court what additional process GLM believes it is due, other than winning on the merits, which is not a matter of process at all. In other words, that the Bankruptcy Court denied GLM the relief it sought does not mean it denied GLM due process. Debtors requested that the identities of the critical vendors be kept confidential, and the hearing was in part held to adjudicate that request. It should thus be no surprise to GLM that when it asked for the names of the critical vendors, the Bankruptcy Court sustained an objection. GLM has failed to identify any due process violations, and its argument on this score is rejected.

### 4. Merits of the Critical Vendor Determination

Finally, GLM argues that "this Court should re[verse] the Bankruptcy Court . . . because neither the Bankruptcy Court's ruling nor the evidence underpinning that ruling justify the critical vendor payments under any standard identified by the case law." (GLM's Mem. at 32.)

As explained in *In re Ionosphere*, a bankruptcy court may authorize payment of prepetition claims on a postpetition basis pursuant to Bankruptcy Code §§ 363(b) and 105(a). *See* 98 B.R. at 175-76. "A bankruptcy court is empowered pursuant to § 363 of the Bankruptcy Code to authorize a debtor to expend funds in the bankruptcy court's discretion outside the

ordinary course of business," and it has "broad flexibility in tailoring its orders to meet a wide variety of circumstances," as long as Debtors "articulate some business justification, other than mere appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business." *Id.* at 175.

Additionally, "to effectuate the policies and provisions of the Bankruptcy Code, the Bankruptcy Court is also empowered pursuant to 11 U.S.C. § 105(a), to 'issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title.'" *Id.* (quoting 11 U.S.C. § 105(a)) (alteration omitted). Thus, "a Bankruptcy Court [may] authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor." *Id.* This "is commonly referred to as either the 'doctrine of necessity' or the 'necessity of payment' rule," which "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor." *Id.* "The doctrine [of necessity], however, receives limited application," and "mere convenience, without necessity, is insufficient." *In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835-36 (Bankr. S.D.N.Y. 1996), *corrected* (Sept. 4, 1996). To "retain the narrowness and the exceptional quality of the Doctrine: (1) the vendor must be necessary for the successful reorganization of the debtor; (2) the transaction must be in the sound business judgment of the debtor; and (3) the favorable treatment of the critical vendor must not prejudice other unsecured creditors." *In re United*, 327 B.R. at 782.

Ultimately, §§ 363(b) and 105(a), as well as the case law interpreting them, serve the purpose of imposing a "duty" on the courts "to maintain the estate for the benefit of *all* creditors." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 178 (emphasis in original); *see id.* at 176

("Thus, the rationale for the 'necessity of payment' rule, *i.e.* facilitating the continued operation and rehabilitation of the debtor . . . is . . . a paramount goal of Chapter 11.").

GLM first faults the Bankruptcy Court for authorizing Debtors in their "sole discretion" to pay their critical vendors, (GLM's Mem. at 32 (internal quotation marks omitted)), but this is the same argument that GLM made regarding impermissible delegation of judicial function – that the Bankruptcy Court impermissibly relied on Debtors' representations and business judgment in identifying and paying critical vendors – just fashioned as a merits challenge. For the reasons discussed above, GLM's challenge to the Bankruptcy Court's process is rejected.

Additionally, GLM misstates the Bankruptcy Court's order. In the Final Order, the Bankruptcy Court authorized Debtors to pay their critical vendors only "up to the amount set forth for each category of Vendor Claims set forth in the [Vendor] Motion." (Final Order ¶ 2.) That amount was set after Debtors laid out the framework that they used to identify the critical vendors, which the Bankruptcy Court found to meet the evidentiary burden required to establish that a vendor is critical. The Bankruptcy Court thus did not grant Debtors sole discretion, but rather deferred to their business judgment regarding when the critical vendors (which were already identified and confirmed by the court) would be paid (up to an amount already calculated and confirmed by the court). Judge Drain ensured that the identification of the vendors was done under a process that used the correct criteria and that payments to any such vendor would be promptly reviewable by interested stakeholders. The Bankruptcy Court fashioned this order under its "broad discretion" pursuant to § 363(b) to ensure that only critical vendors would be paid, while not crippling Debtors' estates by having individual hearings for each of the 263

vendors identified, thereby satisfying its "duty to maintain the estate for the benefit of *all* creditors." *In re Ionosphere*, 98 B.R. at 175, 178 (emphasis in original).[9]

GLM next argues that the Bankruptcy Court's reliance on Debtors' answers to the ten questions identified in the Vendor Motion failed to take into account "the three most critical aspects of the Doctrine of Necessity. . . : that the vendor will refuse to provide goods or services postpetition, that the goods or services are critical to the business, and that the debtor have no meaningful alternative to the vendor." (GLM's Mem. at 33-34.) Additionally, GLM argues that the Debtors' ten-question list does "not include the critical requirement that the vendor . . . refused to supply on a postpetition basis without its prepetition claim being paid." (*Id.* at 33.) These arguments are simply not supported by the case law or the record.

GLM's assertion that the doctrine of necessity requires "that the vendor have refused to supply on a postpetition basis without its prepetition claim being paid" is not supported by the cases that GLM cites. *In re Ionosphere* explained that the "doctrine permits immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid," but nowhere in that case did the court require a formal refusal from each prepetition claimant prior to the

---

[9] GLM's attempt to characterize the Bankruptcy Court's order as paradoxical, (Doc. 10 at 13-14), is ill-conceived. Section 363(b) permits bankruptcy courts to authorize debtors to expend funds "other than in the ordinary course of business." 11 U.S.C. § 363(b)(1). Here, Debtors sought such authorization by filing a motion for court approval to pay prepetition claims on a postpetition basis. While, as GLM asserts, payment of debt is usually in the ordinary course, it is not where a debtor is in bankruptcy proceedings. After receiving written objections and holding a hearing, as required by § 363(b), the Bankruptcy Court granted Debtors' motion. That the Bankruptcy Court fashioned the relief with reference to the "ordinary course of business" does not mean that § 363(b) does not apply. Judge Drain's Final Order – entered only after Debtors had shown its necessity to a successful reorganization – merely permitted payments to be made in the ordinary course that would otherwise not be in the ordinary course because the corresponding debts had been incurred prepetition.

payment of those claims. *In re Ionosphere*, 98 B.R. at 176 (internal quotation marks and alterations omitted). To the contrary, the court there had previously permitted the debtor to continuing paying its own employees despite any indication that they had all formally stated their intention to not come to work if their payment was deferred. Further, *In re United* surveyed the relevant case law on the doctrine of necessity, including *In re Ionosphere*, and laid out the proper three-factor test to consider in applying the doctrine to critical vendors: the vendor must be necessary to successful reorganization; the transaction must be in the debtor's sound business judgment; and other unsecured creditors must not be prejudiced by payment to those critical vendors. 327 B.R. at 782. This test does not require a formal refusal to provide services, and while the existence (or not) of such a refusal is a factor to be considered, GLM has failed to support its contention that it alone is dispositive.[10]

Turning to the record, Debtors asked and answered, among other questions, the following in identifying their critical vendors:

> • "whether a vendor is a sole-source, limited-source, or high-volume supplier of goods or services critical to the Debtors' business operations";
>
> • "whether failure to pay all or part of a particular vendor's claim could cause the vendor to . . . refuse to ship inventory or to provide critical services on a postpetition basis";
>
> • "whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto"; and

---

[10] Even if the cases did require a formal refusal to trigger the doctrine of necessity, the Court would find that application of that rule here would be impracticable. Requiring a refusal from each vendor in a case of this size would be so time- and resource-consuming as to make it impractical, and it would greatly reduce Debtors' leverage in negotiating with their vendors, which would ultimately do harm to the entire estate and all of the creditors.

• "whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, or refuse to ship inventory or to provide critical services on a postpetition basis."

(Vendor Motion ¶ 13.)  These questions directly address the "most critical aspects" of the doctrine of necessity that GLM identifies as being overlooked – that is, whether a vendor will refuse to provide goods or services postpetition without payment, whether the goods or services are critical to the business, and whether Debtors have meaningful alternatives to the vendor.  As noted, the Bankruptcy Court is permitted to put in place efficient procedures for Debtors to follow instead of holding a hearing for each of the 263 vendors, and the procedure in place here required Debtors to answer the "critical" questions necessary for the critical vendor inquiry.  Additionally, GLM's argument that Debtors' consideration of "limited source" or "high-volume" suppliers – instead of merely "sole-source" suppliers – renders the framework flawed is not supported by any authority that only sole-source suppliers can be critical.  The Court can think of many scenarios in which limited-source and high-volume suppliers could also be critical, especially where alternative vendors are not available, which was another question Debtors answered in creating their list of critical vendors.  (*Id.*)  Accordingly, the procedures in place ensured that Debtors were not merely paying out prepetition debts to their preferred creditors.

Finally, GLM argues that the critical vendor list was prepared for convenience, not necessity, but GLM failed to support that argument with any facts or law.  Here, the Bankruptcy Court's summary of its findings spoke directly to the three-factor test set forth in *In re United*, noted above.  *See* 327 B.R. at 782.  The court said it was authorizing Debtors "to spend money to provide a net benefit to their estate in their business judgment, as reviewed by the Court," and the court took measures to ensure that the process "is sufficient" and "protect[s] the Debtor[s'] business for all constituents," by having Debtors provide the matrix to the U.S. Trustee and Official Committee of Unsecured Creditors.  (Hearing Tr. at 109:6-17.)  The Bankruptcy Court

created an efficient procedure whereby it authorized Debtors to answer ten questions, which the Bankruptcy Court developed "from bitter experience in practice," (Hearing Tr. at 108:17-18), to determine whether a vendor was necessary and to ensure that paying the vendor would help rehabilitate Debtors, as opposed to sapping their estates of assets. The Bankruptcy Court gave Debtors the discretion to use their business judgment in deciding which vendors to pay and how much, but only within the confines of its rulings as to the propriety of the critical-vendor designations and the maximum amount of any such payment. And finally, the Bankruptcy Court explained that relying on Debtors' representations regarding the answers to the ten-question test would benefit all creditors, as opposed to requiring costly and time-consuming hearings on each of the 263 proposed critical vendors, which would likely result in "the patient d[ying] on the operating table." (Hearing Tr. at 104:11-13.). That GLM was the only creditor to object to the Vendor Motion, (*id.* at 23:19-20), further supported Judge Drain's conclusion that the critical vendor payments helped, not prejudiced, the unsecured creditors. Accordingly, the Bankruptcy Court appropriately applied the doctrine of necessity in this case.

In sum, the Bankruptcy Court utilized its broad "equitable power" to ensure the rehabilitation of Debtors and viability of the estate for all creditors, by "enabl[ing Debtors] to . . . pay [their] creditors." *In re Ionosphere*, 98 B.R. at 177 (internal quotation marks omitted); *see In re Fin. News*, 134 B.R. at 736 (key consideration is whether paying prepetition claims keeps "reorganization effort alive"). GLM, the sole creditor to object, has failed to show that the Bankruptcy Court erred by doing so.

## IV.    **CONCLUSION**

For the foregoing reasons, the Bankruptcy Court's Final Order is AFFIRMED in all respects.  The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

Dated:  April 3, 2020
         White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.